1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT

9          SOUTHERN DISTRICT OF CALIFORNIA

10
11   MYRON THOMAS,                    )      Case No. 08-CV-1843-W (JMA)
                                      )
12              Petitioner,           )      **REPORT AND RECOMMENDATION**
                                      )      **RE DENYING PETITION FOR WRIT OF**
13   v.                               )      **HABEAS CORPUS**
                                      )
14   MATTHEW CATE, Secretary, et al.  )
                                      )
15              Respondents.          )
                                      )
16   ──────────────────────────       )

17   **I.    Introduction**

18          Petitioner Myron Thomas ("Petitioner"), a state prisoner proceeding pro se, has

19   filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  On May 2,

20   2005, Petitioner was convicted by jury in San Diego Superior Court case number

21   SCD179132 of second degree murder of Roderick Little (Cal. Penal Code § 187(a))

22   (count 1); assault with a machine gun and an assault weapon against Bobby Wilson,

23   Trina Green, and Courtney Henry (id. § 245(a)(3)) (counts 2, 3, and 4); and discharge of

24   a firearm from a motor vehicle at Courtney Henry (id. § 12034(c)) (count 5).  (Lodgment

25   No. 3, Clerk's Transcript ("CT") at 11-15, 337-44, 437.01-02.)  Petitioner contends (1)

26   his trial counsel was ineffective in failing to request an additional jury instruction

27   regarding self-defense, (2) there was insufficient evidence to support one of the great

28   bodily injury sentence enhancements, and (3) the trial court violated his due process

rights by admitting two uncharged acts into evidence.  (See Pet. at 6-8.)

The Court has considered the Petition, Respondent's Answer and Memorandum of Points and Authorities in support thereof, Petitioner's Traverse, and all the supporting documents submitted by the parties.  Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court recommends that the Petition be **DENIED**.

## II.    **Factual Background**

The following statement of facts is taken from the California Court of Appeal opinion, People v. Myron Thomas, No. D047101, slip op. (Cal. Ct. App. Mar. 21, 2007). (Lodgment No. 1, Ex. 1.)  This Court gives deference to state court findings of fact and presumes them to be correct.  Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008). Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  Id.; see also 28 U.S.C. § 2254(e)(1).  The facts as found by the state appellate court are as follows:

> In November, 2003, Thomas was a Lance Corporal in the United States Marine Corps.  He qualified as a "certified expert" shooter and could hit a silhouette from 500 yards away with an M-16 rifle.  Although stationed at Camp Pendleton, he was staying at the home of his supervisor, Sergeant Kayzosky Sanders, along with Sanders's girlfriend, Dustyn, and his nephew, Kenneth Wortham.  In his bedroom closet Sanders kept an AK-47 that he had obtained from Wortham, who he had visited in Mississippi in October 2003.  Sanders brought the AK-47 to California to impress others with it.
>
> Thomas testified that on Nov. 18, 2003, between 7:00 p.m. and 10:15 p.m., he drank alcohol and smoked marijuana dipped in formaldehyde at Sanders's home, while he waited to be picked up by his friends, Bernard Jones, Kenneth Hall, and Kevin Moore.  At approximately 10:00 p.m., these friends arrived, and they went to Club Metro, which is located on the 32nd Street naval base in San Diego.  Thomas was kicked out of the club because he was walking across the dance floor with a drink in his hand. While Thomas was outside, Jones and Jermaine Henderson apparently bumped into each other accidentally inside the club, and an altercation ensued between Jones's friends and Henderson's friends.  The incident ended, and the partying continued.
>
> At approximately 11:30 that night, Thomas used his cellular phone to call a friend, Glean Finley, Jr., to inform him of the altercation in the club and ask if Finley was coming to the club.  Thomas wanted Finley to join him because he knew Finley would fight.  However, Finley was sick, and did not join them.  At approximately 1:00 a.m. on November 19th, 2003, Thomas called Wortham at Sanders's house and said he was being

1    treated like a "fuck boy."

2    At approximately 1:30 a.m., after the club closed and the guests were
     socializing outside, Henderson and Jones resumed their earlier argument.
3    Henderson said he had a 9-millimeter gun, although Jones never saw it.
     The friends of Jones and Henderson were drawn into a large
4    confrontation.  Thomas's friend, Qwana Metoyer, was talking to him
     outside and heard the argument.  She grabbed his arm and told him,
5    "Let's go."  He responded referring to Jones, "No, that's my friend.  If
     something happens, I'm gonna be there."

6
     Military police officers broke up the altercation.  Jones shook hands with
7    Richard Little, one of the men in Henderson's party, and both groups
     started retreating, although Henderson was still making threats.  Thomas
8    walked up and, using profanities, threatened to fight Henderson.  Jones
     had to physically restrain Thomas.  The group of friends returned to Hall's
9    car and headed to the exit of the naval base.  Hall was driving his car,
     Jones was in the front passenger seat, Moore was in the left rear set, and
10   Thomas was in the right rear seat.  When they approached the main gate,
     a military police officer, Darrell Gordon, heard someone in Hall's car say,
11   "We're gonna do a 187," which he understood to mean to shoot or murder
     someone.  A different passenger said, "Shh, there goes the military
12   police."  Someone responded, "I don't give a fuck.  We're still going to do a
     187."  Officer Gordon put his hand on his weapon and told his partner,
13   Juan Salazar, to take cover.  Officer Salazar testified he also heard
     someone in Hall's car say, "We're gonna do a 187."

14
     Thomas and his friends drove to the parking lot of a nearby Del Taco
15   restaurant, located at the corner of 28th and Main Streets, which was
     crowded with people who had been at the club.  Thomas and Metoyer met
16   there, and he identified Henderson to her as the individual who had gotten
     into the altercation with Jones in Club Metro.  Later, Henderson walked
17   towards Jones, who was seated in the car.  Jones told Hall to drive away.
     Thomas was angry, loud and hostile, and tried to get out of the vehicle.
18   Henderson cursed Jones and the occupants of Hall's car.  Jones saw
     something shiny, that could have been a gun, in the area of Henderson's
19   waistband.  As Hall was exiting the parking lot, Jones heard Thomas say,
     "I'm going to kill that nigger;" and, "Let's go get that thing," referring to the
20   AK-47.

21   At approximately 2:09 a.m., Thomas called Wortham at home, and
     sounded excited and angry; he asked if the AK-47 was there, and said he
22   was coming home.  Thomas returned to Sanders's home, and repeated to
     Wortham multiple times, "They tried to treat me like a fuck boy."  Thomas
23   also said he had gotten upset outside the club and had kicked some cars.
     He walked back and forth in the apartment, and went into Sanders's
24   bedroom, where Sanders was asleep, and took the AK-47 from the closet.
     Thomas and his friends drove back to the Del Taco parking lot.  En route,
25   they met two acquaintances, Desmond Dozier and Razaq Kafo, with
     whom they had earlier discussed the night's altercation.  Dozier testified
26   he asked Jones if they had a weapon, and Jones said yes.  During the
     brief conversation, Dozier heard Kafo tell Thomas, "Go the fuck home."
27   Dozier also heard Thomas say something to the effect that, "No, I'm going
     back over there to do something" and, "I'm going to cap that
28   motherfucker," meaning Thomas was going to try and kill or shoot
     someone.

                                        3                                  08cv1843

Sanders phoned Thomas at 2:16 a.m., a minute or two after Thomas had left the house, and Thomas told him about the incident at Club Metro. Sanders told him to come home and not do anything stupid.  Thomas replied that he was on his way home.  Thomas was at the Del Taco by 2:26 a.m., when he received a second call from Sanders, who was concerned he had not returned home.  At 2:35 a.m., Thomas telephoned Metoyer's cell phone, and the only thing he asked her was whether Henderson was still in the parking lot.  She told him Henderson was in front of her car.  Thomas told her he was almost home, and asked her to call him when she got home.

Thomas testified he returned to the parking lot because "he wanted to go and confront them and see what was going on and see if we could just fight it out and get it over with."  Jones told Thomas to give him the AK-47, but Thomas refused.  Thomas testified that within a couple minutes after his call to Metoyer, he heard one of his friends in the car say, "He's got a gun."  Thomas raised the AK-47 about four inches from the level of the lowered window, and fired a first shot in the section of the Del Taco parking lot where he saw Henderson.  [Footnote omitted.]  Jones testified that after the first shot rang out, he reclined his seat to try to impede Thomas from shooting again.  However, Thomas fired five other shots in rapid succession.  Hall drove speedily out of the parking lot, and Thomas stated, "I got that nigger," in what Jones described as a "festive voice." Back at Sanders's house, Thomas bragged to Sanders and Wortham that he had "busted at them fuck boys," meaning he had shot them.  Thomas said he thought he hit three or four individuals in the legs.

Metoyer saw Roderick Little on the ground in front of her car immediately after she heard the gunshots.  She called 911 to report the incident at 2:38 a.m.  Thomas telephoned her after the shooting, and she recounted what had happened.  Thomas admitted under cross-examination that he did not want her to suspect his involvement in the shooting; therefore, in that and other phone conversations he had with her shortly thereafter, he expressed surprise at the information she passed on to him.  Metoyer concluded Thomas was involved in the shooting because, "a few minutes before the shots went off I just spoke with him and told him where the guy was standing, and when we get off the phone the shots ring off."  When the police arrived at the crime scene, she narrated to them her earlier conversations with Thomas, and they instructed her to hand them her phone if he called back.  She did so, and as soon as the officer responded, Thomas hung up the phone.

The police arrived at the crime scene, administered CPR to Little and later took him to the hospital, but approximately an hour later he died from gunshot wounds to the pelvis.  Bobby Wilson, an enlisted member of the United States Navy, was standing in a circle with Little and some friends, and within an arm's length of Little.  A bullet went through both of Wilson's legs, and he spent three nights recuperating in the hospital.  He testified regarding his injuries as follows:  "[T]he bullet is lodged in my left leg, and in my right leg I got complete sciatic nerve damage.  So that pretty much means that I can't move my foot, I can't move my toes, and it just burns." He used crutches for over six months, and at the time of trial needed to wear a brace to help him walk.

Courtney Henry, an enlisted member of the United States Navy, suffered a gunshot wound that penetrated and exited the upper thigh area of his left

08cv1843

1   leg.  He spent one night in the hospital.  Trina Green received a gunshot
2   wound on her leg and needed to use crutches for approximately a week-
    and-a-half.

3   (Lodgment No. 1, Ex. 1 at 3-8.)

4   **III.**    **Procedural Background**

5          On December 21, 2004, the District Attorney for the County of San Diego filed a

6   Second Amended Information charging Petitioner and a co-defendant, Kenneth Hall,

7   with one count of murder, three counts of assault with a machine gun and an assault

8   weapon, and one count of discharge with a firearm from a motor vehicle.  (CT at 11-15.)

9   On May 2, 2005, a jury found Petitioner guilty of second degree murder of Roderick

10  Little (count 1); assault with a machine gun and an assault weapon against Bobby

11  Wilson, Trina Green, and Courtney Henry (counts 2, 3, and 4); and discharge of a

12  firearm from a motor vehicle at Courtney Henry (count 5).  (Id. at 337-44, 437.01-.02.)

13  The jury also found true allegations of intentional and personal discharge of a firearm,

14  an AK-47 assault weapon, causing great bodily injury or death in violation of Cal. Penal

15  Code § 12022.53(d) during the commission of the offenses set forth in counts 1 and 5;

16  intentional and personal discharge of a firearm, an AK-47 assault weapon, in violation of

17  § 12022.53(c) during the commission of the offenses set forth in counts 1 and 5;

18  personal use of an AK-47 assault weapon in violation of § 12022.5(b) during the

19  commission of the offenses set forth in counts 1 through 5; personal infliction of great

20  bodily injury in violation of § 12022.7(a) during the commission of the offense set forth in

21  count 2; and infliction of great bodily injury in violation of § 12022.55 during the

22  commission of the offense set forth in count 2.  (Id. at 337-44, 437.01-.02; 539-40.)

23  Petitioner was sentenced on August 15, 2005 to an indeterminate term of 65 years to

24  life plus 23 years and 4 months.  (CT at 437.01, 538-40.)

25         Petitioner appealed to the California Court of Appeal, Fourth Appellate District,

26  Division One ("California Court of Appeal").  (Lodgment Nos. 5-7.)  On March 21, 2007,

27  in an unpublished opinion, the California Court of Appeal affirmed the judgment.

28  (Lodgment No. 1, Ex. 1.)  Petitioner then filed a Petition for Review in the California

08cv1843

Supreme Court (see Lodgment No. 1), which was denied without comment on June 20, 2007 (Pet., Ex. 1).

On October 9, 2008, Petitioner filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court.  (Doc. No. 1.)  Respondent initially filed a motion to dismiss, which was denied on November 30, 2009.  (Doc. No. 13.) Respondent subsequently filed an Answer on March 1, 2010, and Petitioner filed a Traverse on March 29, 2009.  (Doc. Nos. 18, 19.)

## IV.   Discussion

### A.   Standard of Review

Title 28, United States Code, § 2254(a) sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

The current Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320 (1997).  As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).  The Supreme Court interprets § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under

the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2000); see also Lockyer v. Andrade, 538 U.S. 63, 73-74 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision.  Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).  If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  See Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000) (overruled on other grounds by Lockyer, 538 U.S. at 75-76); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim.  Early v. Packer, 537 U.S. 3, 8 (2002).  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]," the state court decision will not be "contrary to" clearly established federal law.  Id.

### B.   Ineffective Assistance of Counsel For Failure to Request Pinpoint Jury Instruction Regarding Effect of Prior Threats

Petitioner contends his trial counsel, Marc Carlos, rendered him ineffective assistance by failing to request a jury instruction on the principle that "a defendant is entitled to act more quickly and harshly in self-defense if he has previously been threatened by the victim."  (Pet. at 6.)  Petitioner states that given that trial testimony demonstrated that Henderson had previously threatened him and his companions, stated that he had a gun, and in fact had a gun, his counsel's performance was deficient for not requesting such an instruction.  (Pet. at 6.)

Petitioner raised this claim in his petition for review filed in the California Supreme Court on direct appeal.  (Lodgment No. 1.)  That court denied the claim without citation of authority.  (Pet., Ex. 1.)  Accordingly, this Court must "look through"

08cv1843

the state supreme court's denial to the state appellate court's opinion as the basis for its

analysis.  Ylst, 501 U.S. at 801-06.  In denying Petitioner's ineffective assistance of

counsel claim, the California Court of Appeal stated:

> Thomas contends his trial counsel was ineffective because he failed to request a jury instruction to the effect that "a defendant can act more quickly and take harsher measures in self-defense when he has received prior threats from the victim."  [Footnote omitted.]  The familiar two-pronged test for claims of ineffective assistance of counsel, outlined in Strickland v. Washington (1984) 466 U.S. 668, 686-687, requires a defendant to demonstrate the attorney's deficient performance and resulting prejudice because there is a reasonable probability that, but for counsel's conduct, the defendant would have received a more favorable outcome.  If the second prong of prejudice is not established, the reviewing court should reject the claim without analyzing the first prong.  (People v. Kipp, [18 Cal. 4th 349, 366-367 (1998)].)  Here, we have no need to analyze the first prong.

> The trial court instructed regarding self-defense with CALJIC Nos. 5.12, 5.13, 5.14, 5.15, 5.16, [5.17] in seriatim . . . . as follows:

> "The killing of another person in self-defense is justifiable and not unlawful when the person who does the killing actually and reasonably believes:

>> "1.  That there is imminent danger and that the other person will either kill him or cause him great bodily injury; and

>> "2.  That it is necessary under the circumstances for him to use, in self-defense, force or means that might cause the death of the other person for the purpose of avoiding death or great bodily injury to himself.

> "A bare fear of death or great bodily injury is not sufficient to justify a homicide.  To justify taking the life of another in self-defense, the circumstances must be such as would excite the fears of a reasonable person placed in a similar position, and the party killing must act under the influence of those fears alone.  The danger must be apparent, present, immediate and instantly dealt with, or must so appear at the time to the slayer as a reasonable person, and the killing must be done under a well-founded belief that it is necessary to save [one's self] from death or great bodily harm.  [CALJIC 5.12]

> "Homicide is justifiable and not unlawful when committed by any person in the defense of himself if he actually and reasonably believed that the individual killed intended to commit a forcible and atrocious crime and that there was imminent danger of that crime being accomplished.  A person may act upon appearances whether the danger is real or merely apparent. [CALJIC 5.13]

> "The reasonable ground of apprehension does not require actual danger, but it does require (1) that the person about to kill another be confronted by the appearance of a peril such as has been mentioned; (2) that the appearance of peril arouse in his mind an actual belief and fear of the existence of that peril; (3) that a reasonable person in the same situation,

seeing and knowing the same facts, would justifiably have, and would be justified in having, the same fear, and (4) that the killing be done under the influence of that fear alone.  [CALJIC 5.14]

"Upon a trial of a charge of murder, a killing is lawful if it was justifiable or excusable.  The burden is on the prosecution to prove beyond a reasonable doubt that the homicide was unlawful, that is, not justifiable or excusable.  If you have a reasonable doubt that the homicide was unlawful, you must find the defendant not guilty.  [CALJIC 5.15]

"A forcible and atrocious crime, as mentioned in these instructions, is any felony that by its nature and the manner of its commission threatens, or is reasonably believed by the defendant to threaten life or great bodily injury so as to instill in him a reasonable fear of death or great bodily injury.  [CALJIC 5.16]

"A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury kills unlawfully but does not harbor malice aforethought and is not guilty, therefore, of murder.  This would be so even though a reasonable person in the same situation, seeing and knowing the same facts, would not have had the same belief.  Such an actual but unreasonable belief is not a defense to the crime of voluntary or involuntary manslaughter.

"As used in this instruction, an 'imminent' peril or danger means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer.

"However, this principle is not available, and malice aforethought is not negated, if the defendant, by his unlawful or wrongful conduct, created the circumstances which legally justified his adversary's use of force.

"This principle applies equally to a person who kills in purported self-defense or purported defense of another person."  [CALJIC 5.17]

Trial courts are not required to give instructions — such as the one Thomas now suggests — that are redundant or that do not further illuminate the legal standards at issue.  (*People v. Noguera* (1992) 4 Cal. 4th 599, 648.)  Thomas's claim fails because the jury was instructed with CALJIC No. 5.17, which adequately covers the issue of an instant reaction being justifiable in the event of a threat; it states:  "[An] 'imminent' peril or danger means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer."  Thomas's attorney specifically referred to this instruction in his closing argument: "Must be apparent, gun.  You look over, the guy has a gun.  Must be present, gun.  He has a gun.  *He's threatened to kill us*.  And instantly dealt with, fired."  (Emphasis added.)

The jury heard Thomas's testimony regarding his interactions with Henderson at Club Metro and at the Del Taco parking lot, including his claim he fired the shots when Henderson flashed a gun in his waistband. The jury was thoroughly instructed regarding self-defense, the elements of the crime of homicide in the second degree — including the requisite intent — and the prosecution's burden of proof.  Manifestly, the jury did not need the suggested instruction.  Under the circumstances, Thomas was not prejudiced by his attorney's failure to request the suggested

1  instruction.

2  (Lodgment No. 1, Ex. 1 at 17-20.)

3       Under clearly established U.S. Supreme Court law, to establish ineffective

4  assistance of counsel, Petitioner must show that: (1) "counsel's representation fell

5  below an objective standard of reasonableness" and (2) "there is a reasonable

6  probability that, but for counsel's unprofessional errors, the result of the proceeding

7  would have been different." Strickland v. Washington, 466 U.S. 668, 687-88, 694

8  (1984).  "[T]here is no reason for a court deciding an ineffective assistance claim to

9  approach the inquiry in the same order or to even address both components of the

10  inquiry if the defendant makes an insufficient showing on one." Id. at 697.  "In

11  particular, a court need not determine whether counsel's performance was deficient

12  before examining the prejudice suffered by the defendant as a result of the alleged

13  deficiencies." Id.

14       It is settled under California law that a defendant asserting self-defense is

15  entitled, upon request, to a pinpoint instruction on the effect of prior threats against the

16  defendant on the reasonableness of the defendant's conduct. People v. Garvin, 110

17  Cal. App. 4th 484, 488 (2003).  Assuming arguendo that Petitioner's trial counsel's

18  representation fell below an objective standard of reasonableness by failing to request

19  the instruction, however, Petitioner was not prejudiced as a result because there was no

20  reasonable probability that the jury would have reached a result more favorable to

21  Petitioner even if such an instruction had been given. Strickland, 466 U.S. at 694-95.

22  In other words, considering the totality of the evidence before the jury (see id. at 695),

23  there is no reasonable probability that, had the instruction been given, the jury would

24  have concluded that Petitioner acted in self-defense.  The trial court gave six

25  instructions related to self-defense, which instructed the jury to consider all the

26  circumstances as they were known to or appeared to Petitioner at the time of the

27  shooting.  Petitioner, and other witnesses, gave extensive testimony on the events

28  leading up to the shooting, including the threats allegedly made by Henderson, both at

08cv1843

1   Club Metro and in the Del Taco parking lot, and Petitioner's trial counsel thoroughly

2   aired the topics of Henderson's prior threats and self-defense during closing argument:

> Now, what's going on through the minds of the individuals in the car?  We know that at the Club Metro parking lot he's [Henderson's] throwing down the threats.  He's tapping the waistband and he's saying, "Neener, neener, neener, nine-millimeter, nine-millimeter, I've got a gun.  Third Ward New Orleans."  He's basically bragging about what a bad area of town he's from.  [¶]  He's saying, "Come on, I gotcha.  Come on," same thing, "Come on, come on, come on."  Sees them in the car, sees them in the parking lot of the Del Taco, "I told you guys if I saw you again I'd kill you.  I told you," still screaming at them. . . . [T]hen he lifts his shirt. . . .  It was a handgun, showing that he had a handgun, he's ready to use a handgun, combined with threats that were made at the Club Metro, once again at the Del Taco.  He's going to kill us.  He's going to shoot us.  If he sees us again he's obviously crazy enough to do it.  What are we going to do?  What are we going to do? . . . . [¶]  We know from Jones and from other witnesses, there's no talk of killing anybody.  There's no talk of capping anybody.  There's no talk of using the gun.  There is talk of taking care of things, of confronting, of fighting, which is what Mr. Thomas wanted to do.  He wanted to confront this guy and his friends and have a fight, because that's what they know to do.  They want to defend themselves and fight.  [¶]  But the problem is, if these guys have got a gun, they've got to be able to protect themselves.
>
> . . . .
>
> [J]ustifiable homicide allows you to use deadly force when there is imminent danger that the other person will either kill or cause you bodily injury, and it's necessary under the circumstances for him to use in self-defense force or means that might cause the death of the person, for the purpose of avoiding death or great bodily injury to himself.  [¶]  The important part right here is once you go down to the bottom, the danger must be apparent, must be present, must be immediate and instantly dealt with, or must so appear at the time to the slayer as a reasonable person, and the killing must be done under a well-founded belief that it's necessary to save one's life or -- you can make the inference -- another person's life from death or great bodily harm.  [¶]  Must be apparent, gun.  You look over, the guy has a gun.  Must be present, gun.  He has a gun.  Must be immediate.  He's pointing the gun.  He's threatened to kill us.  And instantly dealt with, fired.
>
> . . . .
>
> [T]he scenario that [Thomas] explained -- you know, Jermaine Henderson did have a gun.  He did threaten him with a gun.  He did have that in his mind.  Someone said "gun" in the car.  He explained how he held it with his left hand.  Another witness said he depressed the line of fire by leaning backwards.  You know, it could have happened that way.

27   (Lodgment No. 4, Reporter's Transcript ("RT") at 2844-45, 2856, 2862.)

28         It is unlikely that the jury, upon hearing the evidence, the instructions given, and

08cv1843

the argument of defense counsel would have failed to give Petitioner's position full

consideration.  The jury had sufficient instruction to consider whether Henderson's prior

threats provided reasonable grounds for Petitioner to fear for his safety, and concluded

that they did not.  The additional instruction would have added very little, if anything, to

the jury's deliberations.

Under these circumstances, there is no reasonable probability that, had the jury

been instructed on the effect of prior threats, it would have reached a different verdict.

The Court accordingly finds that the California Court of Appeal's denial of Petitioner's

ineffective assistance of counsel claim was not contrary to or an unreasonable

application of Strickland, and the claim should be denied.

**C.    Insufficiency of the Evidence as to Great Bodily Injury Enhancement**

Petitioner contends that the evidence was constitutionally insufficient to support

the jury's finding as true the allegation that he intentionally and personally discharged a

firearm causing great bodily injury in violation of Cal. Penal Code § 12022.53(d) during

the commission of the crime against Courtney Henry.  (Pet. at 7.)  Petitioner argues that

the only evidence presented concerning the nature of the testimony was Henry's

testimony, and Henry testified only that he felt something burning go through his leg,

walked to his car, drove to the naval base, and spent the night in the hospital.  (Id.)

According to Petitioner, the wound was a "through-and-through wound to the upper left

thigh [which] required no stitches and caused no residual or continuing problems."  (Id.)

Petitioner contends there was no evidence that Henry's injury was "significant or

substantial."  (Traverse at 4.)

In denying Petitioner's claim, the California Court of Appeal stated:

We reject Thomas's contention that, "The 25-year-to-life enhancement
imposed on count 5 for personally discharging a weapon causing great
bodily injury must be stricken because the record does not contain
substantial evidence showing [Courtney Henry] suffered great bodily
injury."

"The determination of whether the harm resulting to the victim constitutes
great bodily injury is a question of fact, and the finding will be upheld if
there is sufficient evidence to sustain it.  [Citation.]  'A fine line can divide
an injury from being significant or substantial from an injury that does not

12

1    quite meet the description.  Clearly it is the trier of fact that must in most
     situations make this determination.'"  (*People v. Lopez* (1986) 176 Cal.
2    App. 3d 460, 464-465.)

3    Here, Henry's injuries are similar to those found sufficient to constitute
     great bodily injury by the court in *Lopez*.  Henry was felled by the bullet
4    that penetrated and exited his upper left thigh; he felt a burning through
     his leg, and spent a night in the hospital for treatment of his wound.  Such
5    evidence is sufficient to sustain the jury's finding of great bodily injury.

6    (Lodgment No. 1, Ex. 1 at 22.)

7        The Due Process Clause of the Fourteenth Amendment guarantees that a

8    criminal defendant may be convicted only "upon proof beyond a reasonable doubt of

9    every fact necessary to constitute the crime with which he is charged."  In re Winship,

10   397 U.S. 358, 364 (1970).  A habeas petitioner challenging a state criminal conviction

11   based upon the insufficiency of evidence is entitled to relief "if it is found that upon the

12   evidence adduced at the trial no rational trier of fact could have found proof of guilt

13   beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 324 (1979).  The

14   critical inquiry "is whether, after viewing the evidence in the light most favorable to the

15   prosecution, *any* rational trier of fact could have found the essential elements of the

16   crime beyond a reasonable doubt."  Id. at 318-19 (emphasis in original).

17       In evaluating a sufficiency of the evidence claim, this Court must look to the

18   applicable state law defining the substantive elements of the crime.  Id. at 324 & n.16.

19   Under California law, any person who, in the commission of the crime of discharge of a

20   firearm from a motor vehicle (Cal. Penal Code § 12034(c)), "personally and intentionally

21   discharges a firearm and proximately causes great bodily injury, as defined in Section

22   12022.7 . . . shall be punished by an additional and consecutive term of imprisonment in

23   the state prison for 25 years to life."  Id. § 12022.53(d).  Section 12022.7 defines "great

24   bodily injury" as "a significant or substantial physical injury."  Id. § 12022.7(f).  "A fine

25   line can divide an injury from being significant or substantial from an injury that does not

26   quite meet the description.  Clearly it is the trier of fact that must in most situations make

27   the determination."  People v. Lopez, 176 Cal. App. 3d 460 (1986).

28       In Lopez, the California appellate court upheld a finding of great bodily injury to

                                          13

two victims of gunshot wounds.  One victim, who was shot in the hip, felt nothing except hitting the ground.  The other was shot in the leg, with the bullet penetrating and exiting the thigh.  She felt "fire" in her leg but was able to drag the other victim to safety.  Id. at 462.  Neither of the victims sought or received medical treatment for their injuries.  Id. at 463 n.5.

Here, the record supports the California Court of Appeal's determination that a rational trier of fact could find beyond a reasonable doubt that Petitioner caused great bodily injury to Henry.  With regard to his injuries, Henry testified that he suffered a gunshot wound to his upper left thigh, and that he felt a burning in his leg at the time he was shot.  (RT at 414-15).  The bullet went through and came out the other side.  (Id. at 415.)  He spent one night in the hospital, but did not receive any stitches and has not had any residual or continuing problems as a result of the gunshot.  (Id.)  Under California law, it cannot be said that this evidence was insufficient to support a finding of great bodily injury.  Indeed, given that Henry's gunshot wound was severe enough to require hospitalization, it is clear that his injury was at least as substantial, and perhaps even more so, than the injuries sustained by the victims in Lopez.

In light of California law, and given the record at trial, a rational trier of fact could have found, beyond a reasonable doubt, that Petitioner caused great bodily injury to Henry.  Accordingly, the claim should be denied.

### D.    Admission of Two Uncharged Acts Involving the AK-47 Into Evidence

Petitioner contends that the trial court's admission of two uncharged acts involving the AK-47 used in the shooting violated his right to due process.  (Pet. at 8; Traverse at 4-6.)  He argues that the admission of evidence concerning two incidents involving Petitioner and the AK-47, one before the subject shooting and one after, was prejudicial evidence of bad character and propensity for assaulting people with firearms, and that there were no permissible inferences the jury could have drawn from the evidence.  (Id.)  In denying Petitioner's claim, the California Court of Appeal stated:

> Thomas contends the trial court erred in admitting into evidence his
> uncharged misconduct of firing an AK-47 outside of Club Hollywood, and

08cv1843

testimony regarding an incident in Los Angeles.

Thomas, through a motion in limine, had sought to exclude evidence regarding these two uncharged acts of misconduct, which he claimed were irrelevant, and impermissible propensity evidence aimed at showing he was a "dangerous individual who uses a gun."  The court denied the motion, ruling that under Evidence Code section 1101, subdivision (b), such evidence was not propensity evidence, and was admissible to prove Thomas's knowledge, opportunity, motive and absence of mistake.  Moreover, its probative value outweighed its prejudicial effect.  The court reiterated this reasoning in its ruling on a motion for new trial.

With respect to the first uncharged incident, the jury heard testimony that on November 14, 2003, five days before the Del Taco incident, Thomas and some friends went to Club Hollywood in downtown San Diego.  Inside the club, one of Thomas's friends had a scuffle with his ex-girlfriend and her date.  After the club closed, the earlier scuffle erupted into a melee between members of Thomas's party and some other men.  Thomas testified he retrieved the AK-47 from the car he had arrived in and fired a total of five shots into the air.  Afterwards, according to a witness, Thomas was bragging and excited.

With respect to the second uncharged incident, the jury heard testimony that three days after the Del Taco shooting, Thomas and his friends, including Sanders and Wortham, drove different cars from San Diego to Los Angeles for a party.  Sanders took the AK-47 with him, and left it in the trunk of the car he rode in.  At the party, Thomas got into an altercation with another marine named "Carrymocasin," who was wrestling another individual outside the door, thus blocking Thomas's way.  Thomas said something to the effect that he had "busted on somebody and he would do it again," meaning he had shot somebody.  Sanders helped separate Thomas and Carrymocasin, who were cursing at each other.  Sanders told Wortham and some other friends to grab Thomas and put him in the car.  Afterwards, Thomas was angry and told Sanders "Give me the fucking keys" to the trunk of the car, because he wanted to reach the AK-47.  Sanders refused to give him the keys.  Thomas's friends had to physically push Thomas toward the car.

Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition; but evidence of uncharged crimes is admissible to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a common design or plan, the absence of mistake or accident, or the intent with which the perpetrator acted in the commission of the charged crimes.  (Evidence Code, § 1101.)  "[I]n order to be admissible to negate a defense of accident or mistake, the uncharged misconduct must be similar to the charged conduct.  [Citation.]  'The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent.'"  (*People v. Burnett* (2003) 110 Cal. App. 4th 868, 881.)  "On appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion."  (*People v. Kipp* (1998) 18 Cal. 4th 349, 369.)  Any prejudice related to the admissibility of prior uncharged crimes is of the sort "inherent whenever other crimes evidence is admitted."  (*Id.* at p. 372.)

Thomas's trial testimony supported the defense of accident.  Specifically, he claimed that when he and his friends returned to the Del Taco parking lot with the AK-47, he heard one of them say, "He's got a gun."  Thomas looked around, saw Henderson lift his shirt and expose a gun.  Thomas "proceeded to pull up on the weapon with my left hand.  At that same time Moore grabbed my shirt and Hall was letting the back seat down, and then the AK-47 fired."

The trial court did not abuse its discretion in admitting into testimony evidence regarding the Club Hollywood incident because such evidence was relevant to prove Thomas had the opportunity to use the gun, although it did not belong to him.  Moreover, such evidence was relevant to impeach Thomas's claim the Del Taco shooting was accidental.

Thomas's statement made during the incident in Los Angeles — that he had previously "busted" an individual and would do it again — was a party admission and admissible as such.  (Evid. Code, § 1220; People v. Homing (2004) 34 Cal. 4th 871, 898.)  The testimony that Thomas had a scuffle with Carrymocasin and afterwards tried to get the AK-47 from the trunk was admissible to place that statement in context.  Thomas's due process rights were not violated by admission of this uncharged act because in light of the totality of the evidence, it was not so prejudicial as to render his trial fundamentally unfair.  (People v. Falsetta (1999) 21 Cal. 4th 903, 913.)

At any rate, any error was harmless because it was not reasonably probable the jury would have reached a more favorable result absent evidence of the prior uncharged incidents.  (*People v. Watson* (1956) 46 Cal. 2d 818, 836.)  The jury rejected a first-degree murder charge and instead convicted Thomas of second-degree murder.  In the face of the overwhelming evidence establishing Thomas's culpability, including his own testimony that he fired the gun, no more favorable result was likely.  On this record, it is safe to say the jury, consistent with the court's instruction with CALJIC 2.50 regarding evidence of other uncharged crimes, rejected the notion that Thomas had a propensity to commit violence based on the uncharged offenses.  Otherwise, it would have convicted him of first-degree murder.  (*People v. Scheer* (1998) 68 Cal. App. 4th 1009, 1023.)

(Lodgment No. 1, Ex. 1 at 8-12.)

The admission of evidence is an issue of state law.  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).  "Simple errors of state law do not warrant federal habeas relief."  Id. (citing Estelle v. McGuire, 502 U.S. 62, 67 (1991)).  On federal habeas, the sole issue is whether the petitioner's conviction violated constitutional norms.  Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); see also Reiger v. Christensen, 789 F.2d 1425, 1430 (9th Cir. 1986) ("The dispositive issue is . . . whether the trial court committed an error which rendered the trial so arbitrary and fundamentally

08cv1843

1    unfair that it violated federal due process.") (internal quotations omitted).

2         "A habeas petitioner bears a heavy burden in showing a due process violation

3    based on an evidentiary decision."  Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir.

4    2005).  The Supreme Court has "defined the category of infractions that violate

5    'fundamental fairness' very narrowly."  Dowling v. United States, 493 U.S. 342, 352

6    (1990).  "Under AEDPA, even clearly erroneous admissions of evidence that render a

7    trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not

8    forbidden by 'clearly established Federal law,' as laid out by the Supreme Court."

9    Holley, 568 F.3d at 1101.  There is no clearly established Federal law, as determined by

10   the U.S. Supreme Court, on the issue of "whether a state law would violate the Due

11   Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to

12   commit a charged crime."  Alberni v. McDaniel, 458 F.3d 860, 864 (9th Cir. 2006) (citing

13   Estelle, 502 U.S. at 75 n.5.)).  There is also no clearly established Federal law, as

14   determined by the U.S. Supreme Court, on the issue of whether "admission of irrelevant

15   or overtly prejudicial evidence constitutes a due process violation."  Id.  Thus, it cannot

16   be said that the California Court of Appeal's rejection of this claim was contrary to or an

17   unreasonable application of clearly established federal law.

18        Additionally, pursuant to Jammal, "[o]nly if there are no permissible inferences

19   the jury may draw from the evidence can its admission violate due process."  Jammal,

20   926 F.2d at 920.  Here, as the state appellate court determined, there were rational

21   inferences, not constitutionally impermissible, that the jury could draw from the evidence

22   of the other incidents involving the AK-47:  Namely, that the evidence impeached

23   Petitioner's defense that the shooting was accidental, and that it established that

24   Petitioner had the opportunity to use the AK-47 though it did not belong to him.

25   Petitioner argues, in response, that he did not rely on the defense of accident, but rather

26   self-defense, and that there was no need to admit evidence of the other incidents

27   involving the AK-47 to show opportunity because there was no dispute that he used the

28   AK-47 on the night in question.  (Traverse at 4-5.)

Petitioner's attempt to depict his defense as resting solely upon a theory of self-defense, and not on accident, is belied by the evidence in the trial record.  Petitioner provided the following testimony at trial:

Q.   You are telling these juries that the whole thing was an accident; is that right?

A.   Yes, sir.

. . .

Q.   Where any of those shots intentional or were all six accidental?

A.   No.  None of them were intentional.

. . .

Q.   All right.  Now, you said at that moment a number of things occur simultaneously, right?

A.   Yes, sir.

Q.   You say Moore is grabbing your left shoulder to try and pull you down?

A.   Yes, sir.

Q.   And Jones is reclining his seat?

A.   Yes, sir.

Q.   And at that same time, you're pulling the trigger six times?

A.   Yes, sir.

Q.   Accidentally?

A.   Yes, sir.

. . .

Q.   Okay, so now your testimony is that all of the shots might have been impacted by Moore touching you?  Is that what you are now telling us?

A.   Yes, sir.

Q.   And all of the shots also might have been impacted by the training that you got in the military?

A.   Yes, sir.

Q.   But every one of those shots was accidental; is that correct?

A.   Yes, sir.  Every shot was not intentional.

1   (RT at 1851, 1856, 1971, 2064.)  Therefore, Petitioner's argument that the evidence

2   was not needed to rebut a defense of accident is without merit.

3          In order to prove that Petitioner was guilty of murder and assault, the prosecution

4   had to demonstrate, *inter alia*, that Petitioner acted with malice aforethought (murder)

5   and acted willfully (assault), both of which relate to whether Petitioner's actions were

6   intentional.  Cal. Penal Code §§ 187, 240; CALJIC 8.10 (murder--defined), 8.11 ("malice

7   aforethought"--defined), 9.00 (assault--defined).  Evidence is relevant if it tends to make

8   any fact relevant to the elements of the crime more or less probable.  McKinney v.

9   Rees, 993 F.2d , 1378, 1382 (9th Cir. 1993).  The evidence concerning the other

10  incidents involving the AK-47 was admissible to dispute Petitioner's claim that he that he

11  did not intend to shoot the AK-47 on the night in question and that the shooting was

12  accidental.  Because it is not the case that there were *no* permissible inferences the jury

13  could draw from the evidence of the other incidents involving the AK-47 (see Jammal,

14  926 F.2d at 920), admission of that evidence did not violate due process.

15         Furthermore, the jury received an instruction regarding its consideration of the

16  evidence of Petitioner's uncharged conduct relating to the AK-47, which provided in

17  relevant part:

18         This evidence, if believed, may not be considered by you to prove that a
       defendant is a person of bad character or that he has a disposition to
19     commit crimes.  It may be considered by you only for the limited purpose
       of determining if it tends to show:
20
       The existence of the intent which is a necessary element of the crime
21     charged[.]

22  (CT at 253.)  The Court must presume that the jury followed the instructions to consider

23  only the permissible inferences.  See Boyde, 404 F.3d at 1173.

24         The California Court of Appeal's conclusion that Petitioner's right to due process

25  was not violated was not contrary to and did not involve an unreasonable application of

26  federal law.  Accordingly, this Court recommends that this claim be denied.

27  //

28

**E.    The Attorney General is Not a Proper Respondent and Should Be Dismissed**

Respondent also contends that Petitioner has improperly named J. Brown, the Attorney General of the State of California, as a respondent in this action.  Rule 2 of the Rules following § 2254 provides that the state officer having custody of the petitioner shall be named as respondent.  Rule 2(a), 28 U.S.C. foll. § 2254.  Only if the petitioner is not yet in custody pursuant to the state-court judgment being contested should both the officer having present custody of the petitioner and the attorney general of the state in which the judgment was entered be named as respondents.  Rule 2(b), 28 U.S.C. foll. § 2254.

Here, there is no basis for Petitioner to have named the Attorney General as a respondent in this action.  Therefore, the Court recommends that the Attorney General of the State of California be dismissed as a named respondent from this action.

**V.    Conclusion and Recommendation**

After a thorough review of the record in this matter, the undersigned magistrate judge finds that Petitioner has not shown that he is entitled to federal habeas relief under the applicable legal standards.  Therefore, the undersigned magistrate judge hereby recommends that the Petition be **DENIED WITH PREJUDICE** and that judgment be entered accordingly.

This Report and Recommendation is submitted to the Honorable Thomas J. Whelan, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  **IT IS ORDERED** that not later than **January 6, 2011**, any party may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."  **IT IS FURTHER ORDERED** that any reply to the objections shall be served and filed not later than **January 26, 2011**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951

08cv1843

F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED:  December 7, 2010

_____
Jan M. Adler
U.S. Magistrate Judge